UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| BRIAN DANIELS, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) No. 1:12-cv-00160-SEB-DML |
| WASTE MANAGEMENT OF INDIANA, LLC, | ) ) ) |
| Defendant. | ) ) ) |

**ORDER GRANTING SUMMARY JUDGMENT**

Plaintiff Brian Daniels brought this lawsuit against Defendant Waste Management of Indiana LLC ("Waste Management") for violations of the Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et. seq.* and the Civil Rights Act of 1866, 42 U.S.C. § 1981, that occurred when Waste Management allegedly terminated him because he is an African American.[1] Waste Management has filed the instant Motion for Summary Judgment [Docket No. 50]. For the reasons detailed herein, Waste Management's Motion is GRANTED.

**Factual Background**

Waste Management provides waste disposal and recycling services to residential and commercial customers. Daniels began working for Waste Management as a truck driver in May

---

[1] Daniels also pled that he was subject to disparate treatment on account of being African American. However, Daniels has since abandoned or waived that claim. In its opening brief, Waste Management argued that it was entitled to judgment with regard to Daniels' disparate treatment claim because the allegedly discriminatory conduct – disparate observation of Daniels' work performance – had not materially altered the terms or conditions of his employment. Daniels failed to address this argument in his response brief and, thus, any opposition he may have had he has waived. Palmer v. Marion County, 327 F.3d 588, 598 (7th Cir. 2003).

2008 and joined the local union, Teamsters Local 135 (the "Union") as a condition of his employment.

During Daniels's employment with Waste Management, he and other employees were subject to observed behavioral assessments ("OBAs") which allowed their supervisors to determine whether they were following all applicable rules and regulations. Normally, a driver was subject to one OBA per quarter, that is, four OBAs per year. However, if a driver became involved in an accident, he was subjected to one OBA every month thereafter for six months. Each month, Daniels's supervisor, Hank Williams, received notification through an electronic tracking program of the drivers due for an OBA. Williams typically scheduled the OBAs and provided notice to that driver of any upcoming OBA.

In addition to the documented OBAs that Daniels received, he claims that Williams also often followed him on his routes or watched him from behind buildings. Daniels calls these instances "silent" OBAs and claims that at times they occurred as often as every other week. It is unclear when the practice of conducting such "silent" OBAs actually began, but Daniels testified that they continued throughout 2010 and into 2011. Daniels Dep. at 59-60. Daniels viewed these silent OBAs as harassment, claiming that he was being targeted in this way because of his race as well as his "timid" or "laid back" personality.[2] Daniels Dep. at 41-42; 63. Daniels maintains that another African American employee, a man named "Kenny," complained to Daniels that he also had been subjected to similar silent OBAs in 2006 or 2007 conducted by a different supervisor. Williams has been unable to identify any other employees, including Kenny, whom Williams subjected to an increased level of silent OBAs. Id. at 63. According to Williams, he made a practice of frequently driving the routes assigned to the drivers he

---

[2] Daniels asserts that at some point in 2009 he complained to his previous supervisor that he was subject to too many OBAs. Apparently, the issue he raised at that time was resolved without incident. Daniels Dep. at 38-39.

supervised in order to look for ways to improve their efficiency and to ensure that the drivers did not need additional help. Williams Decl. ¶ 4.

In April 2011, Waste Management reviewed the performance of all its Indianapolis drivers based on a mathematical formula in an effort to identify the least efficient routes or drivers based on certain identified factors. Williams Dep. at 36-37; Williams Decl. ¶ 7. Williams testified that Daniels was determined to have significantly lower "target yards per hour"[3] compared to the other drivers.[4] As a result, Waste Management enrolled Daniels in the "Most Help Needed" or "MHN" program which included placement of a tracking device in the truck assigned to Daniels. Williams Dep. at 39-40. During the week of May 6, 2011, Daniels conveyed the tracking device to and from his truck. Daniels Dep. at 48; Williams Dep. at 44. However, unbeknownst to him, the following week the device was hard-wired to Daniels's truck for a five-day period. Daniels Dep. at 48; Williams Decl. ¶ 13. Daniels was the first employee to have such a device affixed to his truck. Daniels Dep. at 45. Williams explained that, prior to the use of the tracking devices, a manager would ride along with the driver to record the same type of information as the device was able to mechanically capture. Williams Dep. at 44-45.

Daniels voiced his concerns to Williams regarding the tracking device and the number of OBAs he was subjected to at some point during the Spring of 2011. Daniels Dep. at 44-46. Thereafter, Daniels met with Williams, Ron Pugh (the District Manager and Williams' supervisor), Chip Walker, who was an employee from Human Resources, and a Union Steward.

---

[3] Williams explained that "target yards per hour" measurement is a way of evaluating how many customers and containers a driver is servicing per hour on that driver's route. Williams Decl. ¶ 7. In March 2011, Daniels averaged 41.95 yards per hour, while Waste Management's "target" yards per hour was 53.42. Thus, Daniels was calculated to be performing at 79% efficiency, the lowest efficiency rating of all of the Indianapolis drivers. Id. ¶¶ 8-9.

[4] Also during this same time period, Williams learned that Daniels had missed a container on his route and failed to use the "Haul or Call" process, whereby drivers were to contact dispatch if they were unable to service a container. This constituted Daniels's second failure to use this process, as a result of which Williams issued a documented verbal warning to Daniels.

At the meeting, Daniels expressed his objections to what he viewed as harassment and unfair treatment. Id. at 46-48. Daniels asserts that Williams told him that he would "take care of it." Id. at 47.

Daniels disputes Waste Management's explanation for placing the tracking device in his truck, maintaining that at the time the device was installed, his route efficiency was 100 percent. Daniels Dep. at 52. Daniels bases his route efficiency performance level on an inference drawn from the fact that he was paid between $21-$23 per hour, which was the rate at which employees were paid who were "meeting productivity" or operating at 99-101 percent productivity. Id. at 53.

On May 27, 2011, Daniels worked his usual shift from 3:59 a.m. until 3:10 p.m. In completing his post-shift paperwork, he certified that he had not been involved in any accidents during that shift or suffered any injuries.

Daniels was scheduled to work the next day, on Saturday, May 28th, beginning his shift at 1:00 a.m. However, at 12:05 a.m. that morning – less than an hour before he was to report to work – Daniels called Williams and left him a voicemail message saying that he was sick and thus unable to drive his normal route. Williams directed Mark Wells, the other driver on duty, to cover Daniels's route, which Wells attempted to do, but was prevented from making several of the scheduled stops due to road closures and traffic.

At approximately 7:40 a.m. on May 28th, Williams telephoned Daniels and left him a voicemail message. Daniels testified that he understood this message to mean that he would need to run both routes on his next shift. Daniels Dep. at 107-08. Waste Management asserts, however, that the purpose of Williams's call was to confirm that Daniels was well enough to drive his Sunday route. Thus, Williams informed Daniels that Wells had been unable to perform

several of Daniels's scheduled stops and reminded him that by company policy he would not receive holiday pay unless he worked the scheduled day before and after a holiday.

Instead of arriving at 1:00 a.m. for his May 29th shift as scheduled, Daniels reported for duty six hours early, at approximately 7:00 p.m. on May 28th. From then until 3:00 p.m. the next day, Daniels stayed on the job for slightly over nineteen hours, which involved his driving the truck for approximately sixteen and a half of those nineteen hours. At some point during his shift, the truck Daniels was operating broke down. Rather than contacting his supervisor, Daniels took the broken down truck back to the shop and secured another truck.

During Daniels's next scheduled shift on May 30th, Daniels spoke briefly with Williams, informing him that he had switched trucks during his prior shift. Daniels also inquired of Williams whether he needed a note from a doctor related to his absence from work during the May 28th shift due to a pulled muscle he suffered while getting out of his truck during his May 27th shift.

Following this conversation, Williams reviewed Daniels's driving logs for May 28th and 29th and discovered that the nineteen hours Daniels worked during his May 28-29th shift violated Department of Transportation regulations.[5] Williams also instructed Daniels to complete an Injury Report related to the back injury.

Williams reported to Ron Pugh, Daniels's violation of the DOT hours of service regulations, his failure to report his back injury, and his use of the alternate truck. Williams included no recommendation regarding discipline for Daniels based on these infractions. Williams Dep. at 56.

---

[5] The Department of Transportation's hours of service regulations prohibit a commercial driver from: (a) driving for more than 11 hours after 10 consecutive hours off duty; (b) driving beyond the 14th hour after coming on duty, following 10 consecutive hours off duty; and (c) driving after 60 hours on duty in 7 consecutive days or 70 hours on duty in 8 consecutive days. Williams Decl. ¶ 3.

Based on these failures, Ron Pugh decided to terminate Daniels from employment at Waste Management, which decision was communicated to Daniels at a June 1, 2011 meeting that included the Union Steward, Pugh, Williams, and Chip Walker and occurred after Daniels completed work on his usual route.  Daniels was informed that his termination was based on his violation of hours of service regulations mandated by the DOT, his failure to report an injury that impeded his ability to operate a commercial motor vehicle, and his unauthorized use of company equipment.

On June 5, 2011, Daniels complained in writing to Waste Management claiming that his termination had been without just cause.  This complaint was attached to a formal grievance form filed by the Union on June 6, 2011.  On February 11, 2012, Arbitrator Mark Rosen ordered Waste Management to reinstate Daniels to his prior position without back pay, finding that termination was too harsh a consequence given that Waste Management had failed to establish that Daniels had been intentionally dishonest and that Daniels was the first, and only, driver ever to be disciplined or discharged for violating the DOT's service hour restrictions.  This lawsuit followed.

## Legal Analysis

### I. Standard of Review

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most

favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. See id. at 255. However, neither the "mere existence of some alleged factual dispute between the parties," id., 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. Id. at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. See Shields Enterprises, Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. See Celotex, 477 U.S. at 322; Ziliak v. AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323.

The summary judgment standard is applied rigorously in employment discrimination cases, because intent and credibility are such critical issues and direct evidence is rarely available. Seener v. Northcentral Technical Coll., 113 F.3d 750, 757 (7th Cir. 1997); Wohl v. Spectrum Mfg., Inc., 94 F.3d 353, 354 (7th Cir. 1996). To that end, we carefully review affidavits and depositions for circumstantial evidence which, if believed, would demonstrate discrimination. However, the Seventh Circuit has made clear that employment discrimination cases are not governed by a separate set of rules, and thus remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts. Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410 (7th Cir.1997).

## II.     Discussion

Waste Management asserts that it is entitled to summary judgment on Daniels's claims against it that he was terminated based on racial discrimination in violation of both 42 U.S.C. § 1981 and Title VII.[6]  Under Title VII, it is unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish a case of discrimination using either the direct or indirect method of proof. Daniels has chosen to proceed solely under the direct method and thus our discussion is limited to that method of proof.

To satisfy his burden under the direct method of proof, Daniels may present either direct or circumstantial evidence of discriminatory intent. "The former 'essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus' . . . [and] [t]he latter is evidence that 'allows a jury to infer intentional discrimination by the

---

[6] The substantive standards and methods of proof that apply to claims of racial discrimination under Title VII also apply to claims under § 1981. Vakharia v. Swedish Covenant Hosp., 190 F.3d 799, 806 (7th Cir. 1999) (citations omitted).

decision-maker.'" Buie v. Quad/Graphics, Inc., 366 F.3d 496, 503 (7th Cir. 2004) (quoting Rogers v. City of Chi., 320 F.3d 748, 753 (7th Cir. 2003)). Daniels acknowledges that he does not have direct evidence that Waste Management discriminated against him. Thus, Daniels "must construct 'a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decision-maker.'" Brown v. Advocate S. Suburban Hosp. & Advocate Health & Hosps. Corp., 700 F.3d 1101, 1105 (7th Cir. 2012) (quoting Phelan v. Cook Cnty., 463 F.3d 773, 779 (7th Cir. 2006)). "Typical kinds of evidence used for this purpose include '(1) ambiguous statements or behavior towards other employees in the protected group; (2) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (3) evidence that the employer offered a pretextual reason for an adverse employment action.'" Morgan v. SVT, LLC, 724 F.3d 990, 995-996 (7th Cir. 2013) (quoting Diaz v. Kraft Foods Global, Inc., 653 F.3d 582, 587 (7th Cir. 2011)). Daniels cites circumstantial evidence satisfying the first two categories above. For the reasons explained below, we are not so persuaded.

### 1. Daniels's Evidence that Similarly Situated Employees Outside of his Protected Group Received Better Treatment

Although Daniels asserts that he has evidence that similarly situated employees were treated more favorably, he inexplicably provides almost no evidence or argument to that effect. Only the final paragraph of the four page portion of Daniels's brief purportedly relating to this issue even remotely touches on an identification of any such an employee. The only potential comparator is one Mark Wells. However, the descriptive facts as to Mr. Wells establish that he is a Caucasian employee of Waste Management[7] and, according to Daniels, a member of

---

[7] Daniels also testified that another driver told him that Mr. Wells had stated that he (Wells) and management were going to set Daniels up, referring to him as a "that nigger." Daniels Dep. at 65, 75. Even if this statement were not hearsay, it is entirely irrelevant to whether Mr. Wells is similarly situated to Daniels.

management accorded Mr. Wells more favorable treatment related to adjustments made to the time clock pertaining to his arrival time so to ensure that Mr. Wells would not be clocked in as late.[8] Although a similarly situated employee need not present identical employment circumstances as those of a claimant, the comparator "must be 'directly comparable' to the plaintiff 'in all material respects.'" Good v. Univ. of Chi. Med. Ctr., 673 F.3d 670 (7th Cir. 2012). Daniels has fallen far short in making such a showing that any similarly situated employee, including Mr. Wells, was treated more favorably than he on the basis of which evidence a reasonable jury could infer intentional discrimination.

Daniels also maintains that he has adduced overwhelming evidence to establish that he was treated more harshly than similarly situated Caucasian employees as shown by the arbitrator's determination that other drivers who had violated the DOT service hour requirements were not even disciplined much less terminated. Resp. at 18. However, as Waste Management correctly notes, Daniels has failed to identify any of these drivers and provided the Court with no evidence that they are similarly situated to him or that they were outside of his protected class. Thus, the arbitrator's determination rendered in the context of considering whether Waste Management had violated the Collective Bargaining Agreement, does nothing to cure Daniels's failure to identify any similarly situated individual outside of his protected class who was treated more favorably than he.

### 2. Daniels's "Other Bits and Pieces" of Evidence of Racial Discrimination

Daniels also asserts that he had presented "other bits and pieces" of evidence which, if considered together, support an inference of racial discrimination. Such "bits and pieces" include: (1) Waste Management's decision to place Daniels in the MHN program and to install a

---

[8] The deposition testimony cited for this assertion, page 73 of Daniels's deposition testimony, is not included in the materials designated by Plaintiff.

GPS tracking device on Daniels's truck, and (2) Williams's alleged spontaneous statement that he was *not* racist.  Neither of these circumstances, considered jointly or severally, supports an inference of racial discrimination nor does it "point[] 'directly to a discriminatory reason for the employer's action.'"  <u>Good</u>, 673 F.3d at 675 (quoting <u>Cerutti v. BASF Corp.</u>, 349 F.3d 1055, 1061 (7th Cir. 2003)).

Daniels's contention that he was always at or near 100% efficiency does not create a genuine issue of fact as to why he was placed in Waste Management's MHN program.  Daniels's uncorroborated statements regarding his performance do not support an inference that Waste Management's decisions to place him in the MHN program and/or to terminate him were based on Daniels's race.  <u>Gustovich v. AT & T Communications, Inc.</u>, 972 F.2d 845, 848 (7th Cir. 1992).

Williams's alleged statement that he did not understand why Daniels was accusing him of racism when his own niece is African-American does not, as Daniels concedes, have anything to do with his termination, in particular, that it occurred on account of Daniels's race.  Daniels Dep. at 155.

## Conclusion

For the reasons detailed herein, we hold that Daniels has failed to establish a genuine issue of material fact with regard to his claims of racial discrimination and that Waste Management is entitled to judgment as a matter of law.  Defendant's Motion for Summary Judgment is therefore <u>GRANTED</u> and final judgment shall enter accordingly.

IT IS SO ORDERED.

Date: 11/18/2013

*Sarah Evans Barker*
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

William Martain Krowl
KROWL LAW, LLC
krowllegal@gmail.com

Todd M. Nierman
LITTLER MENDELSON PC
tnierman@littler.com

Brian Lee Mosby
LITTLER MENDELSON, P.C.
bmosby@littler.com